UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, 450 FIFTH STREET, N.W. WASHINGTON, DC 20549-0911<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM W. FREISE, 15868 CONDOR RIDGE ROAD SANTA CLARITA, CA  91387<br><br>Defendant. | COMPLAINT<br><br>Civil Action No. |

Plaintiff, U.S. Securities and Exchange Commission (the "Commission"), alleges:

**Summary**

1.  During the period June 2002 through April 2003, Defendant William W. Freise, ("Freise") the former president and director of Powerball International Inc., ("Powerball" or the "Company") falsified Company records to hide his theft of at least $7,200 and to hide his failure to pay $40,000 for stock he had received resulting from the exercise of warrants.  To conceal his fraud, Freise altered monthly bank statements for Powerball's bank account, which made that account appear that it contained a substantially higher cash balance than it actually contained.   Freise knew that Powerball's financial statements and its reports to the Commission would reflect such false cash balances.

2.  By engaging in this conduct, Freise violated Section 17(a) of the Securities Act of 1933 (the "Securities Act"), Sections 10(b) and 13(b)(5) of the Securities

Exchange Act of 1934 (the "Exchange Act") and Rules 10b-5, 13b2-1 and 13b2-2 thereunder. Freise also aided and abetted Powerball's violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 promulgated thereunder.

3. The Commission seeks a permanent injunction prohibiting future violations of these provisions, disgorgement, prejudgment interest and civil penalties pursuant to Section 21(d)(3) of the Exchange Act and Section 20(d)(1) of the Securities Act. The Commission also seeks an order permanently barring Freise from serving as an officer or director of a public company.

## Jurisdiction

4. This Court has jurisdiction pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Sections 21(e) and 27 [15 U.S.C. §§ 78u(e) and 78aa].

5. The Commission brings this action pursuant to Securities Act Sections 20(b) and (d) and Exchange Act Sections 21(d) and (e).

6. Defendant used the means and instrumentalities of interstate commerce and the mails in connection with the acts and omissions alleged herein.

## The Defendant

7. William W. Freise, age 50, is a Utah resident. Freise was the President and Chief Operating Officer of Powerball from December 2001 to April 2003 and a member of its board of directors from December 2002 through April 2003. Powerball ended its relationship with Freise in April 2003.

**Other Relevant Party**

8. At all times this Complaint covers, Powerball was a Utah corporation with corporate headquarters in Salt Lake City, Utah. At all times this Complaint covers, Powerball, a development stage company that manufactures alternative energy products, had registered its common stock with the Commission pursuant to Section 12(g) of the Exchange Act. Powerball made its stock available for trading on the OTC Bulletin Board (OTC-BB) of the National Association of Securities Dealers (NASD).

**The Quarterly Period Ended June 30, 2002**

9. In or about June 2002, Freise received 40,000 shares of Powerball stock pursuant to the exercise of warrants, but he failed to pay the exercise price of $40,000. In order to obtain the 40,000 shares, Freise made a copy of a personal check for $40,000 payable to Powerball and sent it along with a letter to Powerball's transfer agent. In the letter, Freise instructed the transfer agent to issue 40,000 shares to him, and falsely advised the transfer agent that Powerball had received payment for the shares, when it had not. On June 14, 2002, Powerball's transfer agent complied with Freise's instructions and issued the 40,000 shares to Freise.

10. On or about July 15, 2002, also Freise provided a copy of his personal check to Powerball's treasurer, who was also responsible for preparing Powerball's financial statements, creating the false impression that the check had been deposited by Powerball. Freise knew that Powerball's treasurer would make an entry in the company's books and records reflecting a $40,000 deposit, which Freise never made.

11. To conceal the fact that he had not paid the $40,000 exercise price for the shares that the Company had issued to him, Freise altered Powerball's monthly bank statement for June 2002 to show that the cash balance was $40,000 higher than it actually was. Freise gave the altered bank statement to Powerball's treasurer with full knowledge that this person would incorporate the false cash balance on the altered bank statement in the Company's financial statements and in its Form 10-QSB. Using the false information provided by Freise, Powerball filed a materially false Form 10-QSB with the Commission on August 6, 2002 for the quarterly period ended June 30, 2002.

### The Quarterly Period Ended September 30, 2002

12. In September 2002, Freise withdrew $1,400 from the company's bank account without authorization, and he used at least a portion of the withdrawn funds for personal expenses. When it was time to prepare Powerball's financial statements for the quarterly period ended September 30, 2002, Freise altered Powerball's bank statements to conceal the fact that he had withdrawn that $1,400, and to further conceal the fact that he had not paid the $40,000 for the exercise of the warrants.

13. Freise specifically altered the company's bank statements for July and August to show that the Company's bank account contained $40,000 in cash that it did not contain. Freise also altered Powerball's September 2002 bank statement to make it appear that the balance contained $41,400 more than it actually contained. Freise gave the falsified bank statements to Powerball's treasurer for use in preparing Powerball's financial statements for the quarterly period ended September 30, 2002.

14. In providing the falsified bank statements to Powerball's treasurer, Freise knew that Powerball's quarterly financial statements and its Form 10-QSB would reflect false cash balances. Using the false information provided by Freise, on November 6, 2002, Powerball filed with the Commission a materially false Form 10-QSB for the quarterly period ended September 30, 2002.

### The Yearly Period Ended December 31, 2002

15. On October 8 and 9, 2002, Freise made unauthorized withdrawals of $2,000 and $3,800 from Powerball's bank account and used that money for his own personal expenses. To conceal these withdrawals, Freise altered Powerball's bank statements for the months of October and December 2002. He also concealed the fact that he had still not paid the $40,000 exercise price for the shares he received in June 2002. As a result, Powerball's December 2002 bank statements falsely showed that the Company maintained a cash balance of $102,267 in its bank account for that month when that account actually contained a cash balance of $55,067, or $47,200 lower than the false bank statements showed.

16. Freise presented the altered December 2002 bank statement to Powerball's treasurer with full knowledge that the false cash balance would appear in the Company's financial statements and its materially false Form 10-KSB. Using the false information provided by Freise, Powerball filed its Form 10-KSB for fiscal year 2002 with the Commission on April 9, 2003.

17. In or about February 2003, Powerball's auditor performed the annual audit of its financial statements. During the audit, the Company's treasurer provided Powerball's auditor with the altered bank statements, which reflected the falsely-

inflated cash balances, described above. Freise's fraudulent conduct was not detected by the auditor due to his failure to obtain independent confirmation of Powerball's true bank balances. As a result, Powerball's auditor provided an unqualified audit opinion on the Company's 2002 financial statements that contained the false cash balance.

## Materiality

18. Powerball's misstated cash balance (totaling $47,200) was material relative to the Company's financial statements. As of June 30, 2002, September 30, 2002, and December 31, 2002, the amounts misstated in Powerball's periodic filings with the Commission ($40,000, $41,400, and $47,200, respectively) constituted 9.3%, 12.9% and 32.2% of Powerball's originally reported (but falsely inflated) total assets and 10.0%, 14.3% and 46.2% of its originally reported cash, respectively. In addition, cash was of particular concern to Powerball during this time, because of Powerball's probable need for future funding and the uncertainty of obtaining such funding.

## Powerball's December 2002 "Regulation D" Offering

19. On or about December 23, 2002, Powerball made offers to sell up to 800 units at $1.90 per unit to accredited investors pursuant to SEC Rule 506. Although Powerball sold none of these units, Freise knew or should have known that this offering would mislead investors because the offering documents failed to disclose the Company's false financial statements.

### First Claim
### (Securities Act and Exchange Act Antifraud Provisions)

20. The Commission realleges Paragraphs 1 through 19 and incorporates them here by reference.

21. By reason of the foregoing, Freise violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5 thereunder, in that he knowingly falsified bank statements and records that he knew Powerball's treasurer would incorporate in the Company's periodic reports filed with the Commission. Freise was thus responsible for disseminating materially false and misleading information in the offer, and also in connection with the purchase or sale, of Powerball securities.

### Second Claim
### (Section 13(b)(5) of the Exchange Act)

22. The Commission realleges Paragraphs 1 through 21 and incorporates them here by reference.

23. Throughout the relevant period, Freise violated Section 13(b)(5) of the Exchange Act by knowingly and willfully falsifying Powerball's bank statements to give the false appearance that its bank account contained materially more cash than it actually contained.

### Third Claim
### (Exchange Act Rules 13b2-1 and 13b2-2)

24. The Commission realleges Paragraphs 1 through 23 and incorporates them here by reference.

25. By falsifying Powerball's bank statements, Freise falsified Powerball's books, records and accounts in violation of Exchange Act Rule 13b2-1.

26. By presenting the falsified bank records to Powerball's treasurer knowing that the Company's treasurer would provide those records to its auditor, Freise violated Exchange Act Rule 13b2-2.

## Fourth Claim
## (Aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, and Exchange Act Rules 12b-20, 13a-1 and 13a-13)

27. The Commission realleges Paragraphs 1 through 26 and incorporates them here by reference.

28. Powerball violated Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, and 13a-13 thereunder by filing false and misleading reports with the Commission for the quarters ended June 30, 2002 and September 30, 2002, and its annual report for fiscal year 2002. By overstating the cash balance in its bank account, Powerball failed to prepare those reports in conformity with Generally Accepted Accounting Principles (GAAP).

29. By knowingly falsifying bank statements and corporate records that he knew would appear in the Company's financial statements and in filings with the Commission, Freise aided and abetted Powerball's failure to keep books, records and accounts that, in reasonable detail, accurately and fairly reflected company transactions and disposition of assets.

30. By knowingly falsifying bank statements and corporate records that he knew would appear in the Company's financial statements and in filings with the Commission, Freise aided and abetted Powerball's failure to maintain a system of internal accounting controls that was sufficient to provide reasonable assurance that transactions were

recorded as necessary to permit preparation of financial statements in conformity with GAAP.

31. Thus, Freise aided and abetted Powerball's violations under Section 13 of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, and 13a-13 thereunder.

### Relief Requested

WHEREFORE, the Commission respectfully requests that this Court enter a judgment that:

(a) Enjoins Freise from violating Section 17(a) of the Securities Act and Sections 10(b), and 13(b)(5) of the Exchange Act, and Rules 10b-5, 13b2-1, and 13b2-2 thereunder, and aiding and abetting any violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder;

(b) Permanently prohibits Freise from acting as an officer or director of any issuer which has a class of securities registered pursuant to Exchange Act Section 12, or which is required to file reports pursuant to Exchange Act Section 15(d);

(c) Orders Freise to pay civil penalties under Section 21(d)(3) of the Exchange Act and 20(d)(1) of the Securities Act;

(d) Orders Freise to disgorge ill-gotten gains with prejudgment interest; and

(e) Grants such other relief, as the Court deems appropriate.

Respectfully submitted,

U.S. Securities and Exchange Commission,
Plaintiff

By: _____
James M. McHale, Trial Counsel,
DC Bar 111773
Paul R. Berger
Richard W. Grime
Gregory G. Faragasso
Robert A. Giallombardo
450 Fifth Street, N.W., Mail Stop 0911
Washington, DC 20549-0911
Telephone: (202) 942-4588 (McHale)
Fax: (202) 942-9569 (McHale)
mchalejm@sec.gov

March 31, 2004